UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **UNITES STATES OF AMERICA** ) | |
| ) | |
| v. ) | Case No: 2:23-cr-00328-ACA-GMB |
| ) | |
| **WAYMON LANAR ROBINSON, JR.** ) | |

**MR. ROBINSON'S OBJECTIONS TO THE
MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Mr. Waymon Lanar Robinson, Jr., through undersigned counsel, respectfully submits the following objections to the Magistrate Judge's Report and Recommendation (hereinafter "R&R"), Doc. 37, recommending that the District Judge deny Mr. Robinson's motion to suppress.

**I.    Mr. Robinson objects to the determination that Detective Streit and Mr. Robinson engaged in a consensual encounter and that she did not seize him.**

Mr. Robinson respectfully maintains that Detective Streit briefly detained him when she stopped him on the sidewalk on March 1, 2023. Based on the evidence admitted at the suppression hearing, Mr. Robinson was not free to simply ignore and disengage from Detective Streit and continue walking down the sidewalk. Detective Streit made that clear through a show of authority: While wearing a tactical, law-enforcement vest with her service weapon on her hip, she parked her vehicle along the sidewalk where Mr. Robinson was walking, got out of the car, walked to stand in his path, and said the words "sheriff's office." In response, Mr. Robinson stopped moving and submitted to her questioning. To be sure, Detective Streit did not say the words "stop" or "don't move." But a reasonable person would have interpreted her words and actions as having that meaning and, indeed, that is how Mr. Robinson reasonably understood her words and actions—as did another witness, Detective White, *see infra* p. 2 n.1. As a result, the encounter with Detective Streit was in fact a *Terry* stop.

1

As Mr. Robinson argued, multiple police officers had made their presence in the immediate vicinity obvious through lights and sirens, Doc. 32 at 153, so it was not as though Detective Streit was merely a lone officer in the area who happened to walk up to Mr. Robinson and strike up conversation. On the contrary, a traffic stop had just taken place nearby with one uniformed officer and two plain-clothes officers getting out of their vehicles, and a marked cruiser initiated the stop by turning on its lights and sirens. The officers searched the vehicle they stopped, meaning officers were visibly conducting an investigation in the vicinity just preceding Mr. Robinson's detention.

Mr. Robinson respectfully maintains that construing his submission to Detective Streit's show of authority as a consensual interaction ignores this important context. Where multiple officers are conducting enforcement in the area—as was one of the goals of the operation's detail, *see* Doc. 32 at 70, 165–66—and another officer in a marked, tactical vest parks her vehicle, approaches an individual on foot, positions herself in front of them on the sidewalk,[1] and says "sheriff's office," that person can reasonably conclude they are being stopped, however briefly, and cannot expect to walk away from the officer without recourse. That is just what occurred, causing Mr. Robinson to halt. Because no reasonable person in Mr. Robinson's position would have "fe[lt] free 'to disregard [Detective Streit] and go about his business,'" *see Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)), Detective Streit subjected Mr. Robinson to a *Terry* stop.

II. **Mr. Robinson objects to the determination that the officers had reasonable suspicion to detain him.**

Mr. Robinson also maintains that the officers lacked reasonable suspicion to stop him. For one, Mr. Robinson respectfully disagrees with the conclusion that the "inconsistencies across the

---

[1] Detective White testified that he observed Detective Streit "positioning herself . . . to tell [Mr. Robinson], hey, sheriff's office, stop for a second." Doc. 32 at 168.

testimony of Liles, Blanding, Stewart, Streit, and White," which the Magistrate Judge acknowledged, were not "intentional or material." *See* Doc. 37 at 13. The Court appears to rely on the officers' collective knowledge in finding that, from the totality of the circumstances, the officers had reasonable suspicion that Mr. Robinson was engaged in illegal activity. Consequently, it *is* significant that Detective Liles testified that he "relayed – everything that [he] was seeing in realtime." Doc. 32 at 27.

As the Magistrate Judge noted, Detective Liles served as the unit's "eye of surveillance," as none of the other officers were tasked with actually observing the target residence. *See id.* at 2 (quoting Mr. Robinson's post-hearing brief). In fact, most of the other officers were driving or parked in the surrounding area, not directly surveilling the residence or the people there. *See id.* So, it was Detective Liles' job to radio every observation of note, and to do so accurately. With that in mind, the fact that multiple officers did not remember Detective Liles' apparent radio communications similarly, or could not recall them at all, significantly discredits Detective Liles' observations and testimony. And this is not the first occasion that Detective Liles has provided inconsistent testimony during a suppression hearing: The Government moved to dismiss *United States v. Dortch*, 2:21-cr-00347-MHH-GMB, after then-Deputy Liles's testimony during a suppression hearing contradicted what he had told the Assistant U.S. Attorney during a preparation session. *See* Doc. 28 (parties' stipulation).[2] All told, Detective Liles' credibility issues significantly undermine the officers' actual, collective knowledge based on the information from Detective Liles on which they all relied.

---

[2] Specifically, Deputy Liles first told the AUSA in preparation that "he couldn't recall whether he saw [a] pistol prior to opening the door" of the defendant's car but later testified that "he saw a pistol in the car in plain view prior to opening the car door." *See id.* at 1. The AUSA "made defense counsel aware of the conflicting statement during a recess in defense counsel's cross-examination of Deputy Liles" and later moved to dismiss the case "due to what he believed to be Deputy Liles' confusion and waffling on cross examination in combination with the above-referenced inconsistent statement." *Id.* at 1–2.

Several legal conclusions made in the R&R rely upon testimony by Detective Liles that Mr. Robinson respectfully maintains is not credible, despite the R&R's finding that it is. In general, "a district court must rehear the disputed testimony before rejecting a magistrate judge's credibility determinations" except in the "rare case" where the transcript contains "an articulable basis for rejecting the magistrate's original resolution of credibility," and that basis "is articulated by the district judge." *United States v. Cofield*, 272 F.3d 1303, 1306 (11th Cir. 2001). Mr. Robinson has raised material inconsistencies in Detective Liles' testimony in this matter, *see* Doc. 34 at 8–12, and cited the prior contradictory testimony Detective Liles gave in the *Dortch* matter, *id.* at 13. However, to the extent that the Court cannot fully assess the R&R's credibility finding without rehearing the testimony, Mr. Robinson asks the Court to reopen the evidentiary hearing to hear Detective Liles testify in person.

Second and importantly, Mr. Robinson also respectfully disagrees with the conclusion that "the court could entirely disregard Liles' testimony without undermining a finding of reasonable suspicion." Doc. 37 at 14. The Magistrate Judge summarized and concluded as follows:

> [T]here were a number of incriminating facts independently known to the other JCSO officers by the time Streit approached Robinson. They knew he was in a high-crime area near an alley where several suspects were engaging in apparent hand-to-hand drug transactions. Doc. 32 at 71, 73. They knew several men fled on foot when Stewart drove into the alley with his lights and sirens activated. Doc. 32 at 153. And a short time after the men scattered, they knew Robinson was walking away from the alley on 51st Avenue while holding the front of his waistband. Doc. 32 at 154. This was more than enough for the JCSO officers to reasonably suspect that Robinson may have been engaged in criminal activity.

*Id.* This narrative does not suffice to generate reasonable suspicion that Mr. Robinson was engaged in or about to engage in criminal activity. Mere presence in a high-crime area is insufficient for reasonable suspicion; the operative factor is evidence of flight from law enforcement. *See United States v. Gordon*, 231 F.3d 750, 756 (11th Cir. 2000). There is no compelling evidence here that Mr. Robinson was trying to flee from law enforcement.

4

In *Gordon*, for instance, the Eleventh Circuit affirmed a finding of reasonable suspicion where the defendant was in an area known for violent crime and drug trafficking and, when a marked police cruiser approached, the defendant's eyes lit up, he moved quickly toward another vehicle, and the vehicle drove off in the opposite direction. *Id.* The Circuit noted:

> Gordon and his co-Defendants were sighted standing, at night, within ten feet of a parked car, surrounded by largely abandoned buildings, in an area notorious for violent crime and drug trafficking. Standing alone, these facts would not have justified this stop. But there is a critical additional fact in this case: the Defendant's flight. It is the powerful evidence of flight that drives the district court's findings and dictates the outcome of this appeal.

*Id.* In this case, setting aside Detective Liles' testimony for its inconsistencies and credibility problems, the officers never witnessed *Mr. Robinson* fleeing the area, either by walking or running, as a result of the traffic stop. Rather, they saw him walking in a high-crime area on a path that recrossed the area of the traffic stop. Put another way, Mr. Robinson was walking on a nearby sidewalk that *brought him in view of the officers* gathered in the alleyway and did not evince any clear intent to flee (by walking or by running).[3] And, upon seeing Detective Streit in a marked vest announce her affiliation with the sheriff's office, Mr. Robinson did not run away. He stopped.[4]

These facts also distinguish Mr. Robinson's case from *United States v. Hunter*, 291 F.3d 1302 (11th Cir. 2002), one of the cases that the Magistrate Judge cited in determining that the officers had reasonable suspicion. *See* Doc. 37 at 14–15. As the R&R noted, in *Hunter*, "(1) Mr. Hunter was in a high crime area, known for drug and firearm arrests; (2) Mr. Hunter was standing

---

[3] Simply seeking to avoid police contact in a high-crime area is insufficient to generate reasonable suspicion. It is evasion of police that moves the needle. *See Illinois v. Wardlow*, 527 U.S. 119, 125 (2000) ("[I]t was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police. . . . Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.").

[4] The R&R concludes that Mr. Robinson was not seized, and, if he was seized, officers had reasonable suspicion to seize him. It concludes that on the one hand, Mr. Robinson could have continued to walk past Detective Streit and decline to speak with her, yet that Mr. Robinson's walking route away from the direction of law enforcement is also a significant factor that generates suspicion against him.

over and observing unlawful gambling; (3) Mr. Hunter saw the police approach and then began to walk quickly away; and (4) as Mr. Hunter turned to walk away, Officer Adams saw a bulge in his waistband." *Hunter*, 291 F.3d at 1306. By contrast, in this case, though the officers believed that Mr. Robinson was in a high-crime area, without Detective Liles' inconsistent testimony, there is no evidence that Mr. Robinson was associating with the people at the target residence, where police believed—though never confirmed, through photographs, stops, arrests, or otherwise—that individuals were conducting narcotics transactions. Further, as stated above, there is no evidence that Mr. Robinson "walked quickly away" upon law enforcement's approach. *See id.*

Finally, Mr. Robinson's case is also unlike *United States v. Brazzle*, upon which the R&R also relies. *See* Doc. 37 at 15–16. There, the officer "testified he saw the outline of what appeared, consistent with his training and experience, to be a weapon in Brazzle's waistband as Brazzle walked toward the car" and away from officers in a "high-crime area." *United States v. Brazzle*, 2018 WL 6981240, at *4 (N.D. Ala. July 20, 2018). The officer also "observed Brazzle make a movement that seemed to be an effort to hide something in the floorboard, all the while keeping deliberate eye contact with the officers." *Id.* The Court determined that "[t]his apparent effort to conceal something from the officers [was] at least some indication of criminal activity," particularly when paired with "Brazzle's evasiveness," which "may not [have] suffice[d] for reasonable suspicion standing alone." *Id.* Again, by contrast, Mr. Robinson's case lacks strong evidence that Mr. Robinson, upon seeing the police, deliberately turned to evade them.

In short, the R&R's decision to credit Detective Liles's testimony is crucial to its reasonable-suspicion finding, because aside from his testimony, the evidence does not show sufficient legal justification for stopping him. Mr. Robinson continues to assert that the only confirmed, credible information the detectives had in their possession at the time of the stop was

6

that a man was generally walking near the area of a traffic stop in a neighborhood known for alleged criminal activity. The officers lacked reliable information that Mr. Robinson was fleeing the police, slowly or quickly, after interacting with people at the target residence. Instead, they knew only that he was a pedestrian in the area—a pedestrian who, as soon as an officer got in his path and displayed her law-enforcement affiliation, submitted. Because these facts do not give rise to reasonable suspicion, Mr. Robinson respectfully maintains that this Honorable Court must suppress the evidence obtained against him.

    Respectfully submitted,

    KEVIN L. BUTLER
    Federal Public Defender
    Northern District of Alabama

    */s/ Kevin R. Roberts*
    Kevin R. Roberts
    Assistant Federal Public Defender

    */s/Mia Gettenberg*
    Mia Gettenberg
    Assistant Federal Public Defender

    Federal Public Defender's Office
    Northern District of Alabama
    505 20th Street North, Suite 1425
    Birmingham, AL 35203
    (205) 208-7170

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2024, the foregoing was filed with the Clerk of Court and docketed electronically using the Court's CM/ECF system, which will provide notice to counsel of record.

>  */s/ Kevin R. Roberts*
>  Kevin R. Roberts
>  Assistant Federal Public Defender